Good morning, Your Honors. Assistant State's Attorney Christine Cook on behalf of the people. Your Honors, Assistant State's Attorney Eric Lee Bled on behalf of the people. Justices, I'll be addressing any questions regarding firearms. Are you there reserved some time before we vote? Yes, just a few minutes. Okay. Thank you. Good morning. May it please the Court. Again, I'm Jennifer Von Traeger from the State Appellate Defender for Antelito Jones. This Court's decision from June should stand. The majority correctly concluded that Antelito's pro se post-conviction petition set forth a colorable claim of his actual innocence and also demonstrated cause and prejudice with new evidence, supporting his claim that his confession was coerced by now notorious polygraph examiner Robert Bartik. To the actual innocence claim, Telvin Shaw's affidavit is newly discovered, material, and conclusive evidence of Antelito's actual innocence. As this Court correctly concluded, Antelito had no idea Shaw existed until meeting him in the Prison Law Library. The affidavit is certainly material and conclusive as well. Shaw witnessed the shooting, carried out, as he saw it, by Melvin Alone. Shaw witnessed the entirety of the shooting, running home only after the shooting was over, and he attested that Melvin Alone shot Green. He would have seen anyone else. He had a view of the shooting. He watched it. The State presented no eyewitness testimony at trial. Antelito's disavowed confession was the only direct evidence linking him to the shooting. There's no physical evidence that links to Antelito. He was not immediately arrested at the scene. Nothing but that disavowed confession links him to the shooting. It is thus legally possible that, following an evidentiary hearing at a new trial, that Antelito would be acquitted. This Court's conclusion then, that Antelito set forth a colorable claim of actual innocence, was correct. This Court also correctly concluded that Antelito's petition adequately alleged facts demonstrating cause and prejudice for his claim that his confession was coerced. Just like in People v. Almodovar, Antelito relied on a Chicago Tribune article implicating Bartik in an emerging pattern of coercing confessions. That is, Antelito was finally able to demonstrate a pattern of misconduct by Bartik in other cases to support his claim that he was coerced by Bartik into making this confession. He also demonstrated prejudice because, again, this disavowed confession is the only evidence that links Antelito to the crime. And if Bartik did coerce him, that constitutes prejudice under Almodovar. Yeah, well, you keep talking about prejudice, but isn't the issue here really whether this defendant may even file this post-conviction petition? Isn't this what this is all about? Right. It's at the leave to follow. I mean, you know, this is a very low threshold, is it not? Yes, absolutely, Your Honor. For the actual innocence, it's simply the colorable claim standard and just the cause and prejudice standard for leave to follow the successive petition. I mean, the real problem here is that he gives a confession, you see, and although there's no eyewitnesses at trial and there's no physical evidence at trial, there's still that confession that he claims was coerced. Correct. But he gave a confession, and his confession made sense, did it not? Sort of. I mean, it's not... Well, sort of. I mean, he told how he did it, and that's the problem of the case. You know, sometimes when you make up a lie, you can't remember your lie, but this confession was a confession that made sense as to this particular murder, and that's what we have to deal with here. Right, but he, even before trial, even before his trial so long ago... Yeah, and at pretrial he claimed he was innocent, at trial he claimed he was innocent, and at post-trial he claimed he was innocent. Yes, he's consistently claimed he was innocent. Okay, and how about the State knowing about two witnesses and not giving you that information until after the trial? How did that affect everything? Minimally, Your Honor. It was brought up post-trial as a potential Brady violation by counsel. Once it all got hashed out, the brothers had not... They had spoken on sort of general terms. They hadn't spoken about whether Antolito was in a particular place at the time of the shooting or not. Antolito relied on it in his first post-conviction petition. He never actually adopted that particular alibi. Exactly. I mean, he's always claimed he was at home. Yes, exactly. He said he was at his mom and dad's, and the two brothers, I forgot their names. I haven't read the... The Thomas's. Yeah. He never said he was there. Correct. I mean, he could have been. His mom could have gone to bed. He could have sneaked out. He could have sneaked back in. I don't know, but those are... Mom's son sleeping. Right. Okay. I mean, those are... He claims... At the time, he's supposed to be at home with his mom at the same time. They say he's partying with them, and the boy's father's putting them out, or the boy's father's not putting them out. Those two statements from those brothers was ridiculous. And I think, Your Honor, that's why trial counsel only brought them up in the post-trial motion as a potential priority violation. Exactly. It's not an issue. Right. Absolutely. What about the newspaper article? I mean, granted, at the time of the trial, he wasn't aware of the information that was contained in the article, but he did become aware of it at the time when he filed his first post-conviction petition. Actually, not until after he filed the first post-conviction petition was he aware of the emerging evidence of the pattern and practice of misconduct by Bartek. You're talking about what, in terms of time? I don't have the date in front of me, but 2010, June of 2010 is when the article was published. I believe the dismissal of his first post-conviction petition had already been affirmed by this court at that point. At the very least, he had well before that filed it, and it was done at the very least at the trial court level. I believe it was already affirmed on appeal at that point as well. I don't have that date in front of me. But once he had that, he went ahead. He didn't wait and collect even more. He went with, here's an emerging pattern and practice of misconduct by this officer. This is what I've been trying to say since the beginning, since the get-go, is that this guy coerced me into making this false confession. Definitely established as causing prejudice for his claim. If there are no other questions, I'll reserve the rest of my time. Thank you. Let's hear from the State. May it please the Court, Counsel. This Court should affirm the lower court's denial of leave to file this successive petition of actual innocence, as defendant could not make a culpable claim of actual innocence. Regarding the affidavit of Taldon Shaw. Does he have to make a culpable claim of actual innocence here? Does he have to do that? Yes. In order to file a successive petition for actual innocence, a culpable claim must be established. Tell us what is a culpable claim. A culpable claim is something that could be legitimate. It's going to be hard for me to describe the standard for that. Something that could be legitimate, noteworthy, that would cause a court to bring the defendant's conviction into question. Something that would undermine the integrity of the original conviction itself and at no time has the defendant met his burden in this case. By submitting the affidavit of Taldon Shaw, Taldon Shaw's affidavit corroborates all of the trial testimony and in no way exonerates this defendant. According to Edwards, the defendant in this case would have to be exonerated by virtue of the fact that Mr. Shaw is eliminating him from the crime scene. Taldon Shaw doesn't do that. I would like to pay particular attention to Mr. Shaw's affidavit that he talks about what he was able to see. And what he was able to see was very limited. The shooting took place on 72nd Street as the victim's car was facing eastbound on Damon. Mr. Shaw was behind him on Sealy on the south side of 72nd Street in a gangway. Not only was his view blocked by shrubbery, but by the house directly across the street from him that would have been on the southeast corner of Sealy and 72nd Street. The evidence in this case shows that when Jerry Green went to his car on 72nd Street, he was approached by Melvin Jones on the street in front of his car like this. And according to the defendant's confession, he and Travis Ashkey were on the other side of the car, on the curbside of the car, making them on the south side of 72nd Street. There's no way that Mr. Shaw wouldn't have been able to see them from that vantage point. And at no time does Mr. Shaw ever say that Melvin Jones was the only person there, nor does he say he was the only shooter. All Talvin Shaw says is that Melvin Jones was the only person I saw. That in no way contradicts the evidence. It also shows that the defendant's confession is completely corroborated by the physical evidence. This court found in the initial first post-conviction petition, and I quote, there was a significant body of evidence corroborating the details provided by the defendant in his statement. And that certainly remains true even with Talvin Shaw's affidavit. The defendant stated in his videotape confession that Melvin approached the victim at the car door on 72nd Street. And in fact that is true, as the .380 caliber casings were found exactly where the defendant said that Melvin Jones had been standing when he fired and killed Jerry Graham. The fired bullets also at that scene corroborate that in fact Melvin Jones had a .380, because those were the casings that were found on the street side of the car. The defendant also said in his videotape confession that the co-defendant, Ashby, was on the passenger side, that thing on the sidewalk side, on the south side near the sidewalk. And that's where the 9mm casings were found, just precisely as the defendant had admitted in his videotape confession. The defendant said that he had a .357, that Melvin Jones had a .380, and that Shaw had a .45 or 9mm. And the ballistics evidence at the scene show exactly that to be true. And Talvin Shaw does nothing to undermine those facts. In Shaw's affidavit, didn't he say that Melvin Jones was the lone shooter and was alone? Didn't he use the word alone? Yes, he says Melvin stood alone by himself in front of this individual, that being the victim Jerry Graham. And this is something he observed, that this Melvin Jones was the shooter, he was alone. That's what he said. Yes, that is what he saw. Right, that's what he saw. And if he saw that, and he's the only one that saw anything, then shouldn't this go to at least a second stage where they have to make a substantial showing? No, not at all. Because again, according to the defendant's videotape confession, Melvin Jones was on the street side of the car, and Mr. Ashby and the defendant were on the passenger side of the car. They weren't standing together. And by virtue of the fact that Talvin Shaw is behind the car... You're going into the credibility... Not at all, Justice, not at all. I'm going into an objective statement of facts. There is no way that Talvin Shaw could have seen what was on the sidewalk on the passenger side of the car because he's behind the car on the next stopover of House South in the gangway. Now, he never says, according to Edwards, which would be required, that the defendant was not there. He doesn't say that Melvin was the only person shooting. He said he was alone. Doesn't that mean alone? There's nobody else? No, not at all. What does that mean by that? That's an advantage point. Melvin was alone, standing on the driver's side of the car. That absolutely is true, and in no way contradicts the evidence or would undermine the conviction outcome in this case. The fact that Travis Ashby and the defendant are on the other side of the car and that view is blocked by Mr. Shaw does nothing to undermine the conviction in this case. Melvin Jones was, in fact, alone on that side of the car from his vantage point, which was blocked. There's no question about that, and even according to Edwards, Telling Shaw would have to come up with a lot more just than, I saw Melvin Jones and he shot the victim. We know that's true. We know that's true from the ballistics evidence, and we know that's true from the defendant's own confession. Everything in the defendant's confession is corroborated by the physical evidence and by Telling Shaw's affidavit. There's nothing that undermines the conviction in this case. We also have the witness accounts, which are really significant in this case. Curtis Moore lived in the house on the, let me get this straight, on the northeast corner of ceiling 72nd Street. When the victim left Curtis Moore's house from the back door, he went straight across the street to his car, and the victim then was attacked and confronted on his side of the car. Curtis Moore said he was on the phone, returning some phone calls, when he hears two different sounds of gunshots. One, he said, sounded like it was right underneath his window. That would be the .357 fired by the defendant. Otis Deal, who lived just on Damon on the southwest corner, who had military experience, testified at trial exactly as Mr. Moore. I heard two to three different sounds of gunfire, some louder than others, and that is corroborated by the physical evidence located at the scene, as well as the defendant's own videotape statement. Making a credibility determination was up to the jury, and the jury not only found the defendant guilty, they also found that the defendant had personally discharged a firearm. All of the witness accounts, Mr. Deal and Mr. Moore, are corroborated by the physical evidence and by the defendant's own confession. And Mr. Shaw... Shaw has testified before the jury, they might have had a different result. No, not at all, because again, his view is limited, and does nothing to undermine the evidence presented by the state. It doesn't undermine the notion that there are nine millimeter casings on the passenger side of the car, where, according to Tal and Shaw, Melvin Jones was not. Melvin Jones was in the street. But your argument is that his view was limited, and you know, in every case, every witness's view is limited to some extent. Sure. And everybody sees something different. You can have ten people see a murder, and you'll get ten different witnesses telling ten different stories, and they could all be telling the truth. Sure. Although I'm not in any way suggesting that you don't believe Mr. Shaw. But Mr. Shaw's affidavit only corroborates every piece of evidence, and does nothing to undermine the conviction in this case. In fact, his affidavit, if he was allowed to testify, would corroborate the physical ballistics of the case, would corroborate the defendant's own videotaped confession, would corroborate everything. But he basically absolves the defendant. Not at all, Justice. Not at all. Melvin Jones is in the street, Ashby and the defendant are on the sidewalk. And we know that's true not only from the defendant's own confession, but from the ballistics evidence at the scene. From the two witnesses who testified, I'm hearing different gun sounds. That's corroborated by the ballistics evidence in this case, and the defendant's own confession. The witness accounts are significant, and cannot be undermined by this court on review, as the trial jury found not only that the defendant was accountable, but that he actually discharged a .357 at that scene. Furthermore... Well, if that's the case, then at a second or a third stage, all that will be brought out, then. If this man's an innocent man, he'll go free, and if he's not, he won't. But the significant question this court has to ask, Justice Gordon, is is there a colorable claim of actual innocence that would allow leave to file to be granted? It's a very low threshold. Right, but Tillman shows up to David, never gets off the ground, can't meet the threshold. Because he corroborates all of the trial testimony. He does nothing to undermine the conviction. But he also says that the other fellow was alone. So, you see, all that together, to me, shows that it's possible that this man wasn't there. No, with all due respect, Justice, he doesn't say that Melvin Jones was alone. He says, I saw Melvin Jones shoot the victim. That does nothing to exonerate the defendant. He used the word alone, I remember the word alone. He says Melvin Jones stood alone by himself in front of this individual. Melvin Jones was the lone shooter, was alone. Standing on that side of the street. Well, that's what you're saying, he was standing on that side of the street. And I'm not saying that you're wrong. But I'm only saying that Melvin Jones was the lone shooter, he said, and he was alone. And that is important evidence also. It's evidence that that's what he saw from his limited vantage point. That's the facts. The law, according to Edwards, would not allow this court to reverse. Because according to Edwards, which is almost exactly the same types of facts, Mr. Shaw has not claimed the defendant was not there. He does not claim the defendant was not shooting. And just like this court found in the first post-conviction petition, his allegations are cleverly drawn. I think it's more like an Ortez case than it is an Edgerton case. Oh, no, no, no, nothing like that at all. Again, in Ortez, the defendant can always bring a new witness to support a claim of actual innocence. There's no bar to that. Ortez only gets you around from a race judicata bar. But in no way under Ortez could Melvin Shaw's affidavit be deemed to be a culpable claim of actual innocence. It certainly is not. All Tubman Shaw says is, I saw Melvin Jones standing in front of the victim, exactly like the defendant said, and exactly like the ballistics evidence say, and he shot the victim. That's completely corroborative of all of the trial testimony. As far as the testimony... Well, you're kind of running out of time. I am running out of time, sir. I will conclude quickly. The affidavits or the purported statements of Anthony and Derrick Thomas and Melvin Jones are inappropriate because they were not claims made in the second petition. They've been rejected on the first post-conviction petition. The circumstances of the defendant's confession are not odd. They are, in fact, refuted by the defendant directly, who wrote twice to his parents that he was never touched by the Chicago police officers whatsoever. And the Chicago Tribune article can only be assessed in an actual innocence claim. At no time in this successive post-conviction petition did this defendant ever submit the Tribune article under a cause-and-prejudice standard. The trial court did not reject this claim on a cause-and-prejudice standard because it wasn't submitted as such, and this court, under the Act, is precluded from doing so. It in no way, under actual innocence claims, provides any evidence that would undermine the conviction of this defendant. It does nothing to support the claim that he was coerced by his confession or that these officers acted inappropriately in light of the fact that he has affirmatively denied in his own letters to his parents that he was ever mistreated by the Chicago police officers. For all of the reasons stated here in all of our briefs, the people respectfully request that this court affirm the denial of leave to file this successive post-conviction petition. Thank you. Thank you. Rebecca? Just briefly, Your Honors, I'd like to point out that, in fact, Taubenshaw's affidavit differs remarkably from the affidavit presented in People v. Edwards in the Illinois Supreme Court. Taubenshaw's is much more detailed, and it is worth pointing out that the affidavit in Edwards was from a co-defendant who crafted something to say, well, he wasn't really involved. Taubenshaw here says, I saw one shooter. Taubenshaw had a perfectly fine vantage point for seeing what was said. How about the argument that the State has given here that Melvin Jones, from his vantage point, could only see one side of the story? You mean Taubenshaw? I don't think that's borne out by the evidence. He says he's standing in a gangway. He sees across the street. He sees well enough to describe the color, the make of the car. He is able to identify Melvin Jones. Even from that gangway, there's nothing in the parkway blocking him. If there were individuals standing on the other side of the car, he certainly would have been able to see them from that vantage point. For those, nothing provides to the contrary. He had a perfectly fine view and saw a single shooting, witnessed a single shooting, saw no muzzle flashes from any other shooters, saw Melvin Jones shoot the victim in this case. If there's nothing else, this court's opinion from June should stand. Thank you. I would like to make one comment. I think that both lawyers here did a terrific job in all of the writings and in the argument. But I would comment that the Assistant State's Attorney, the second time I've heard her, I've been doing this for 58 years, and I think she's one of the best I've ever heard in my life. It's a pleasure to hear such arguments. And we'll take this case under advisement. Court is adjourned.